Michael D. DAVIS, Plaintiff–Appellee,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY and Cigna Corporation, Defendants–Appellants.

Nos. 90–6466, 91–5048.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 28, 1991.

Decided Feb. 4, 1992.

Rehearing Denied March 3, 1992.

See also 743 F.Supp. 535.

R. Stephen Doughty, Bussart, Buffaloe & Doughty, Nashville, Tenn. (argued and briefed), for plaintiff-appellee.

Thomas P. Kanaday, Jr., James G. Ramsey (briefed), Farris, Warfield & Kanaday,

Nashville, Tenn., Gregory B. Tobin, Philadelphia, Pa., (argued and briefed) for defendants-appellants.

Before KEITH and NELSON, Circuit Judges, HOOD, District Judge.*

KEITH, Circuit Judge.

Defendants–Appellants Connecticut General Life Insurance Company ("Connecticut General") and Cigna Corporation ("Cigna") appeal the jury verdict in favor of Michael D. Davis ("Davis") for breach of an employment contract. The jury awarded $469,283 to Davis. For the reasons stated below, we REVERSE the jury's verdict and vacate the award.

### I.

Davis, a resident of Nashville, Tennessee, was employed by Life Insurance Company of North America ("LINA"), a Pennsylvania corporation and Connecticut General Life Insurance Company, a Connecticut corporation. Both Companies are subsidiaries of Cigna corporation that market, sale and underwrite group pension products. Cigna provides staff services to Connecticut General and LINA, but does not participate in the pension product business.

Davis started his career with LINA in Nashville, Tennessee in 1971. He was promoted to assistant director of sales in 1983. In this position, Davis was responsible for pension sales in six LINA sales offices covering about one half of LINA's entire United States territory.

In 1986, Davis' responsibilities were substantially reduced because he was demoted from assistant director of sales to regional sales manager. As regional sales manager, Davis was responsible for supporting the sales of field representatives through independent brokers of LINA pension products in LINA's Indianapolis, Cincinnati and Nashville offices. In addition, Davis participated in a cross selling project in which he became responsible for the direct sale of Connecticut General's pension products by LINA brokers to customers in the Nashville area. Joe Donahue, Connecticut General's southeastern regional manager for the group pension division based in Atlanta, assisted Davis in this sales effort. Donahue, however, never directly supervised Davis. In October 1987, the cross-selling experiment ended nationwide because of poor sales.

In 1987, Gordon Murphy, the president of LINA, and George Trumbull, the president of Connecticut General's group pension division, consulted John Lombardi and Ed Jasudawich to evaluate cost savings methods in the pension area. Lombardi, an assistant vice president in the Connecticut General group pension division, and Jasudawich, the head of the LINA pension division, decided to integrate the LINA pension sales operation with Connecticut General's. Consequently, LINA's administrative staff was merged with Connecticut General's relatively larger staff. In addition, LINA's six regional managers became Connecticut General employees.

Furthermore, Lombardi and Jasudawich concluded that two of LINA's six nationwide regional pension managers should be eliminated. Lombardi recommended retaining the positions in the four offices with the best geographic location suited to servicing the field sales people. Davis' job in Nashville and the manager's job in Dallas were eliminated.[1]

On January 28, 1988, Lombardi travelled to Nashville to notify Davis that his job was being eliminated. Lombardi delivered a letter that stated that Davis' job as a regional pension manager was being eliminated as of February 25, 1988, and that he was eligible for an internal job search, outplacement assistance, and severance benefits under Connecticut General's Work Force Management Policies. Lombardi also told Davis that he must call Connecticut General's personnel office in Hartford within five days if he wished to accept the maximum severance package. The Work Force Management Policies provision re-

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. The Atlanta regional pension manager assumed Davis' responsibilities.

garding the internal job search read as follows:

> If you desire, the company will make a reasonable effort to assist you in attempting to locate an open job in a suitable alternative position. The search will be undertaken for a period of four weeks beginning January 28, 1988, and ending February 25, 1988. Should you fail to request an internal search, be offered and refuse what the company considers a suitable alternative position or refuse to interview for one, your eligibility under the work force management policies will cease. A suitable alternative position is one which matches your skills and qualifications, is the same, or at most, has a salary grade two salary grades below your present position salary grade, is in the same group as your present position and is in the immediate geographic area.

Davis thereafter contacted Sandra Hayes, an employee in the personnel department, to notify her of his intent to participate in the job search on January 28, 1988. Davis was terminated on February 25, 1988. Connecticut General paid Davis thirty four weeks of severance pay, maintained his insurance coverage through October 1988, and also paid Davis for his accrued vacation time. Subsequently, Davis encountered little success in his search for employment.

On May 2, 1988, Connecticut General hired Barbara Gay ("Gay") as a pension sales person in Nashville. Gay, who resigned from a position with Connecticut General in Atlanta effective February 16, 1988, had relocated to Nashville because of a pending marriage. Connecticut General testified that Davis was also considered for this position.

Davis' complaint alleged that defendants wrongfully terminated him by breaching his contract of employment. He also alleged that Connecticut General and Cigna did not fulfill its agreement and obligation to conduct an "internal job search". Davis further alleged that if the defendants did conduct the job search, they did not in fact make the reasonable effort required in the agreement. Finally, the complaint alleged that Connecticut General was guilty of age and gender discrimination.

The district court granted the defendants' summary judgment motion on the age and gender discrimination claims because the complaint did not state a cognizable claim. The district court also dismissed the wrongful termination claim because Davis was an employee-at-will that could be terminated for any or no reason at all. The district court, however, denied defendants' summary judgment motion for breach of contract for failing to conduct an "internal job search." This sole issue proceeded to trial.

The jury trial began on July 24, 1990, and concluded on August 2, 1990. On August 2, 1990, the jury returned a verdict for breach of contract and awarded Davis $469,283. The trial court denied defendants' motions for a directed verdict and for a judgment *n.o.v.*. This appeal timely followed.[2]

## II.

Connecticut General and Cigna argue on appeal that the district court erred in denying their motion for a directed verdict and for judgment *n.o.v.* because no contract ever existed which requires Connecticut General to conduct an internal job search because Davis was an employee-at-will. Davis counters that on January 28, 1988, Connecticut General effectively terminated his employment, and at that point Davis then entered into a new and separate agreement for Connecticut General to conduct an internal job search.

We first address Davis' contention that he was terminated effective January 28, 1988, the date that he was notified that his job was being eliminated as part of Connecticut General's downsizing. We disagree.

Davis' termination letter does not indicate that he was a terminated employee as of January 28, 1988. Connecticut General

---

**2.** Davis originally appealed the district court's summary dismissal of the gender discrimina-tion claim. However, this issue is no longer on appeal.

issued the termination letter to Davis which specifically noted that Davis' employment ends on February 25, 1988. The letter stated in pertinent part:

As a result, I must regretfully inform you that your job will be eliminated on February 25, 1988 ...

Because your job will be eliminated, you will be eligible for an internal job search, outplacement assistance and benefits under the company's Work Force Management Policies provided you remain employed through February 25.

This is in accord with the Work Force Management Policies which state under the provision entitled "TERMINATION OF EMPLOYMENT DATE" that "[t]he last day of the *Notification Period*" shall be the termination date. (emphasis added) The "Notification Period" starts four weeks prior to the termination date.[3] We conclude, therefore, that Connecticut General's termination letter on January 28, merely placed Davis on notice, as required by its corporate policy, that his employment was to end on February 25. As a result, we find that Davis remained an at-will employee during the entire period.

■ Since we hold that Davis remained an at will employee, the dispositive issue on appeal is whether the Work Force Management Policies created a contract to conduct an internal job search. We believe that the analysis employed to determine whether an employee handbook or manual creates a contract for an at will employee is applicable. *See Wilmer v. Tennessee Eastman Co.*, 919 F.2d 1160 (6th Cir.1990).

Our Court has held that an employee handbook or personnel manual does not create a guaranteed contract right unless the language manifests contractual intent on the employer's part or states that the policy included therein is guaranteed. *Wilmer v. Tennessee Eastman Co.*, 919 F.2d 1160, 1163 (6th Cir.1990); *See also Hamby v. Genesco*, 627 S.W.2d 373, 376 (Tenn.App. 1981) (the court found contractual intent where the handbook specifically stated that the policies in the handbook were "guaran-

teed."). *Id.* at 376. In the instant case, the Work Force Management policies fail to evidence a contractual intent to conduct an internal job search. Moreover, the Work Force Management Policies do not state that the internal job search policy is guaranteed. In fact, Section VIII of the Work Force Management Policies provides:

The Policies are subject to amendment, change or termination without notice at the discretion of management and no provision herein shall create or establish or be considered or construed as creating or establishing any right, property, contract or otherwise, in or on behalf of any employment.

The Work Force Management Policies only demonstrates defendants' desire to help eligible employees. This policy is offered to employees without benefit to the company. This fact and Section VIII clearly show that the Work Force Management Policies are not intended to be anything other than a gratuitous service provided to employees such as Davis; there was never an intent to enter into a contractual agreement. Indeed, defendants had the discretion to alter the policy without input from eligible employees. Therefore, we hold, as a matter of law, that the Work Force Management Policies did not create a contract.

Accordingly, the district court erred in denying defendants' motions for a directed verdict and for judgment *n.o.v.*. We, therefore, REVERSE the jury verdict and vacate the judgment awarded.

■

---

**3.** The Work Force Management Policies define the "Notification Date" as "the date the Notice is given to an Eligible Employee." Thus, Davis' "notification date" was January 28, 1988.